# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| C.H. ROBINSON WORLDWIDE, INC., a Delaware corporation, <br><br> Plaintiff, <br><br> v. <br><br> COMMAND TRANSPORTATION, LLC an Illinois limited liability company, PAUL LOEB, an individual, and ERIC HARRISON, an individual, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Case No. 05 C 3401 <br><br> Judge Amy St. Eve |

## NOTICE OF FILING

To:    Mitchell L Marinello (Trial Attorney)
       Joseph Nacca (Trial Attorney)
       Novack and Macey LLP
       303 West Madison Street – Suite 1500
       Chicago, IL 60606

       Stephen Fedo
       William J. Tarnow
       Neal Gerber & Eisenberg LLP
       2 North LaSalle Street – Suite 2200
       Chicago, IL 60602

       PLEASE TAKE NOTICE that on December 6, 2005, the Plaintiff filed its **Second Amended Complaint,** in the United States District Court, Northern District of Illinois, Eastern Division, a copy of which is attached and is hereby served upon you.

C.H. ROBINSON WORLDWIDE, INC.

By: _____
           One of Its Attorneys

Michael D. Wexler
J. Scott Humphrey
Seyfarth Shaw LLP
55 East Monroe Street, Suite 4200
Chicago, IL  60603-5803

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

C.H. ROBINSON WORLDWIDE, INC., a )
Delaware Corporation, )
                               )
         Plaintiff, )
                               )    Case No.  05 C 3401
    v. )
                               )    Judge Amy St. Eve
COMMAND TRANSPORTATION, LLC, )
an Illinois Limited Liability Company, )    **JURY TRIAL DEMANDED**
PAUL LOEB, an individual, and ERIC )
HARRISON, an individual, )
                               )
         Defendants. )
                               )

## SECOND AMENDED COMPLAINT

Plaintiff, C.H. ROBINSON WORLDWIDE, INC. ("C.H. Robinson") brings this Second

Amended Complaint against Defendants COMMAND TRANSPORTATION, LLC

("Command"), PAUL LOEB ("Loeb"), and ERIC HARRISON ("Harrison")(collectively

"Defendants"), and, for its causes of action, C.H. Robinson states as follows:

### INTRODUCTION

In 1999, C.H. Robinson paid well over $100,000,000.00 to acquire substantially all of the

assets of a logistics company called American Backhaulers ("Backhaulers"). While there were

many facets to the purchase, two of the most integral components of the transaction were the

exclusive acquisition of a proprietary software program called Express and the execution of non-

competition, non-solicitation and confidentiality agreements by Backhaulers' principals Jeff

Silver and Paul Loeb. Despite the large sum of money paid for these items and despite

contractual, statutory and common law obligations to the contrary, C.H. Robinson has come to

learn, on information and belief, that Loeb and a former C.H. Robinson employee and Express

software developer Harrison, through and for the benefit of Command Transportation, LLC,

have improperly obtained, utilized or retained C.H. Robinson's proprietary information, source code, object code and functionality to duplicate C.H. Robinson's Express software in a software program called Slingshot and have taken numerous other actions in an apparent conspiracy to solicit C.H. Robinson employees, to improperly acquire current proprietary information of C.H. Robinson and to violate on-going confidentiality obligations owed to C.H. Robinson. The Defendants' actions are so egregious and the software programs Express and Slingshot so similar, that the software programs utilize the same keystrokes and short cuts and the Defendants have even recently hired away multiple C.H. Robinson employees with experience training employees on the operation of Express to presumably train Command employees and/or agents on Slingshot.

C.H. Robinson is in the business of providing commercial logistics services, including the use of roads, highways, air, ocean and/or the railroad system, to transport or arrange for the transportation of goods in trailers and/or containers on behalf of third parties from a point of origin to their final destination throughout the United States and elsewhere (collectively "Freight Brokerage Services"). C.H. Robinson is one of the industry leaders in Freight Brokerage Services. Subsequent to acquiring Backhaulers, C.H. Robinson converted its entire business operation to the Express software system. It also required Loeb, Harrison and Jeff Silver to execute and honor restrictive covenants to protect its substantial investment. Consequently, the Defendants cannot be permitted to use C.H. Robinson's property, diminish its substantial investment nor violate contractual, statutory and common law obligations.

## PARTIES, JURISDICTION AND VENUE

1.       Plaintiff, C.H. Robinson, is a Delaware corporation with its principal place of business in Eden Prairie, Minnesota. On or about December 16, 1999, C.H. Robinson purchased certain assets of Backhaulers for well over $100,000,000.00 which included, among other things,

2

the Express software program, know-how, restrictive covenants and business information. The exclusive use of the Express software is a key component of C.H. Robinson generating billions of dollars in revenues, well in excess of the $75,000.00 jurisdictional requirement.

2.     C.H. Robinson is in the business of providing commercial logistics services, including the use of roads, highways, air, ocean and/or the railroad system, to arrange for the transportation of goods in trailers and/or containers on behalf of third parties from a point of origin to their final destination throughout the United States and elsewhere.

3.     On information and belief, Defendant Command Transportation, LLC is a Delaware Limited Liability Company registered to conduct business in Illinois with its principal place of business in Illinois located at 7500 Frontage Road Skokie, Illinois 60077. Command also conducts business under the assumed names DND Express and DND Logistics. Command was previously known as Command Logistics Systems, LLC. On information and belief, Loeb and Silver are the members of the Command LLC and are investors and otherwise affiliated with Command. Command purports to be in the Freight Brokerage Services business in competition with C.H. Robinson.

4.     Defendant Paul Loeb is domiciled at and resides at 223 Linden Park Place Highland Park, Illinois 60035. Loeb was the former owner of Backhaulers and was paid millions of dollars in December 1999 upon C.H. Robinson's acquisition of Backhaulers' assets and in exchange for the execution of a non-compete, non-solicitation and confidentiality agreement. On information and belief, Loeb is a member of Command and an investor and otherwise affiliated with Command Transportation, LLC.

5.     On information and belief, Defendant Eric Harrison is domiciled at and resides at 715 Astor Lane #407 Wheeling, Illinois 60090. Harrison began his career at Backhaulers on or

3

about June 28, 1993 and was a key developer of the Express software. Upon C.H. Robinson's purchase of Backhaulers' assets, Harrison moved to Minnesota as C.H. Robinson's Director of Technology to implement and further develop Express across all of C.H. Robinson's business. On or about April 1, 2002, Harrison voluntarily left C.H. Robinson, moved back to Chicago, Illinois and was subject to a Management Employee Agreement containing non-competition, non-solicitation, confidentiality and invention assignment provisions.

6.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, based upon C.H. Robinson claims arising under the Computer Fraud and Abuse Act, Title 18 U.S.C. § 1030, et seq., and the Copyright Act of 1976, 17 U.S.C. § 101, et seq. This Court has supplementary jurisdiction over C.H. Robinson's remaining claims pursuant to 28 U.S.C. § 1367. This Court has personal jurisdiction over Command, Loeb, and Harrison, and venue is proper in this District and this Division under 28 U.S.C. § 1391(a), because Command's principal place of business is here, Loeb and Harrison are residents of this District, Defendants conduct business here, Defendants have breached and threaten to breach certain duties and obligations owed to C.H. Robinson in this District, and a substantial part of the events giving rise to these claims occurred in this District and Division. Venue is also proper under 28 U.S.C. § 1400(c) because an action relating to a copyright may be instituted in any district where a defendant may be found.

### OTHER RELEVANT PERSONS

7.      Jeff Silver ("Silver") was one of the former principals of Backhaulers and was paid millions of dollars in cash and stock in December 1999 upon C.H. Robinson's acquisition of Backhaulers' assets, including Express, and in exchange for the execution of a non-compete, non-solicitation and confidentiality agreement. On information and belief, Silver is a member of

4

Command LLC and an investor or otherwise affiliated with Command Transportation, LLC.
Silver was also instrumental in the development of Express.

8.     Scott Carlson ("Carlson") was an employee of C.H. Robinson from on or about
July 17, 2000 through his voluntary resignation on or about April 29, 2005. Carlson was an
employee whose duties included training new employees with regard to the Express software
system. Carlson trained numerous C.H. Robinson employees to use and operate efficiently its
Express software. Carlson executed several confidentiality, non-competition and compliance
agreements with C.H. Robinson to safeguard C.H. Robinson's intellectual property and
proprietary information.

9.     Andy Epstein ("Epstein") was an employee of Backhaulers and joined C.H.
Robinson in December 1999 as a result of C.H. Robinson's purchase of the assets of
Backhaulers. Epstein was a highly productive manager of a freight brokerage group for C.H.
Robinson. Epstein was terminated from C.H. Robinson on or about February 15, 2005 for
improper conduct related to the allegations alleged herein. Epstein, like other C.H. Robinson
employees, received training regarding the confidentiality of C.H. Robinson's proprietary
information, executed an employment agreement containing confidentiality requirements as well
as certain post-employment restrictions regarding improper competition, executed a data security
agreement and executed numerous acknowledgements attesting to compliance with C.H.
Robinson's Code of Ethics.

10.     Brian Berk ("Berk") was an employee of Backhaulers and joined C.H. Robinson
as a result of C.H. Robinson's purchase of the assets of Backhaulers. Berk was a highly
productive manager of a freight brokerage group for C.H. Robinson. In early 2005, C.H.
Robinson discovered that Berk was using his C.H. Robinson computer to communicate directly

5

with Loeb. C.H. Robinson was concerned about the tone and content of the communications
between Loeb and Berk. On February 14, 2005, Berk's managers confronted him about the
nature and content of his communications with Loeb. Berk indicated that he had failed to
appreciate the inappropriate nature of his communications and that he had not been offered
employment by Loeb or Command. On May 20, 2005, Berk terminated his employment with
C.H. Robinson and indicated to his managers that he was going to work for Loeb and Command,
and that he had been in negotiations with Loeb and Command for several months. Berk, like
other C.H. Robinson employees, received training regarding the confidentiality of C.H.
Robinson's proprietary information, executed an employment agreement containing
confidentiality requirements as well as certain post-employment restrictions regarding improper
competition, executed a data security agreement and executed numerous acknowledgements
attesting to compliance with C.H. Robinson's Code of Ethics.

      11.    Phil Broering ("Broering") was an employee of Backhaulers and joined C.H.
Robinson in December, 1999 as a result of C.H. Robinson's purchase of the assets of
Backhaulers. Broering worked in the IT department of C.H. Robinson and his duties included
assisting with the maintenance of Express. Broering's attendance and performance began to
suffer greatly in the summer of 2004 and his employment was terminated. On information and
belief, Broering subsequently went to work for Loeb and Command where his duties include
assisting with the maintenance of Slingshot. Broering, like other C.H. Robinson employees,
received training regarding the confidentiality of C.H. Robinson's proprietary information,
executed an employment agreement containing confidentiality requirements, executed a data
security agreement and executed numerous acknowledgements attesting to compliance with C.H.
Robinson's Code of Ethics.

6

12. Kevin Sherwood ("Sherwood") was an employee of Backhaulers and joined C.H. Robinson in December, 1999 as a result of C.H. Robinson's purchase of the assets of Backhaulers. In 2004, Sherwood was the manager of C.H. Robinson's branch office in Ann Arbor, Michigan. In late 2004 and early 2005, Sherwood exercised and sold all of his available C.H. Robinson stock and options. A C.H. Robinson Vice-President asked Sherwood if there was a specific reason why he had sold the stock and he indicated that he needed to do so for personal financial reasons but that he had no intention of leaving C.H. Robinson or going to work for Loeb and Command. Several weeks later, on or about February 1, 2005, Sherwood resigned and indicated that he was in fact going to work for Loeb and Command. Sherwood, like other C.H. Robinson employees, received training regarding the confidentiality of C.H. Robinson's proprietary information, executed an employment agreement containing confidentiality requirements as well as certain post-employment restrictions regarding improper competition, executed a data security agreement and executed numerous acknowledgements attesting to compliance with C.H. Robinson's Code of Ethics.

13. David Ardell ("Ardell") was an employee of Backhaulers and joined C.H. Robinson in December, 1999 as a result of C.H. Robinson's purchase of the assets of Backhaulers. During the course of his employment, Ardell held various positions. Like Carlson, Ardell spent a significant amount of time as a trainer. As a trainer, his duties included training new employees on the operation of Express. On January 19, 2005, Ardell resigned from C.H. Robinson and indicated that he was going to work for Loeb and Command. At the time of his departure, Ardell was acting as a carrier representative. Ardell, like other C.H. Robinson employees, received training regarding the confidentiality of C.H. Robinson's proprietary information, executed an employment agreement containing confidentiality requirements,

7

executed a data security agreement and executed numerous acknowledgements attesting to compliance with C.H. Robinson's Code of Ethics.

## NATURE OF ACTION

14.     This is an action for violation of the Computer Fraud and Abuse Act, misappropriation of trade secrets, breach of contract, conversion, and copyright infringement. C.H. Robinson seeks compensatory, punitive and statutory damages, as well as attorney's fees and costs.

15.     Loeb and Harrison individually or in concert with one another and/or Command, Silver, Ardell, Carlson, Sherwood, Broering, Epstein, or Berk are directly or indirectly violating their confidentiality and non-competition agreements and applicable law by acquiring, retaining and/or utilizing without authority C.H. Robinson's proprietary software Express, hiring a C.H. Robinson Express trainer or others and soliciting proprietary information from C.H. Robinson employees to compete unfairly and to essentially utilize C.H. Robinson property which had been purchased from Backhaulers, Loeb and Silver for millions of dollars.

## BACKGROUND

16.     For many years, C.H. Robinson has been a national leader in providing logistics services, and other support services, for the transportation of freight throughout the United States, across state lines in interstate commerce, and elsewhere. In essence, C.H. Robinson is a travel agent of sorts for freight. C.H. Robinson has contracts with thousands of independent carriers with whom it contracts to move freight on behalf of its customers.

17.     Through the use of various systems, C.H. Robinson employees provide services by which C.H. Robinson analyzes a customer's business and determines how efficiencies in the shipment of supplies and goods can be achieved.

8

18.     C.H. Robinson also provides Less Than Truckload ("LTL") services. Where a customer may have only a pallet of goods to be shipped, C.H. Robinson arranges for the pallet to be consolidated with the pallets of other customers so as to create a full truckload so that one semi-trailer can be used to ship the goods more economically and efficiently.

19.     C.H. Robinson is a leader in customer support and service through the use of a well trained staff, the use of technology and the establishment of strong customer relationships.

20.     C.H. Robinson has invested millions of dollars to create a computerized network throughout the United States, proprietary software and acquire other software to insure that C.H. Robinson can provide excellent logistics planning and service to its customers. Not only has C.H. Robinson invested in software to support its logistics planning and analysis, but it has also invested in software to permit its customers to electronically transmit and communicate their freight shipping needs to C.H. Robinson. Additionally, C.H. Robinson's computerized network allows its employees to communicate and share data through multiple servers, desktop computers and laptop computers throughout the United States as well as utilize the Internet for communication and selling efforts.

21.     C.H. Robinson has also spent extensive time and resources culling customers and developing and analyzing information about customers which have the ability to ship sizable loads on a regular basis. Further, C.H. Robinson has spent considerable resources and time establishing relationships with thousands of carriers willing to accept certain payment terms and operate in the appropriate lanes of transportation or routes. Likewise, C.H. Robinson has spent extensive time and resources identifying the lanes of shipment or routes of carriers most beneficial to C.H. Robinson's customers. Once these pieces of information are identified, it is integrated into C.H. Robinson's proprietary software for easy access through C.H. Robinson's

9

proprietary computer network and integration with other relevant information accessible on a need to know basis by C.H. Robinson employees throughout the United States.

23. C.H. Robinson has purchased through acquisitions and on its own developed and maintained valuable long-term relationships and substantial goodwill with its customers. C.H. Robinson's business information, long-standing customer relationships and goodwill are of paramount significance to its business reputation and its success.

23. In order to grow its business and better serve its customers, C.H. Robinson has acquired other freight brokerage businesses throughout the United States such as Backhaulers and has acquired proprietary software at great expense.

24. Backhaulers was a Chicago based freight brokerage company with sizable office space, numerous employees, proprietary software, a computerized network, goodwill and numerous customer relationships.

25. Backhaulers was owned by Paul Loeb and Jeff Silver was a principal and key employee. On or about December 16, 1999, an asset purchase agreement and related documents were entered into between C.H. Robinson, Backhaulers, Loeb and Silver ("Asset Purchase Agreement"). Pursuant to the Asset Purchase Agreement C.H. Robinson acquired all of the assets of Backhaulers by paying well over $100,000,000.00.

26. Pursuant to the Asset Purchase Agreement, C.H. Robinson purchased substantially all of Backhaulers' assets including, but not limited to, Employee Non-Competition and Confidentiality Agreements, all rights to customized and proprietary software including Express, Backhaulers' know-how, and Backhaulers' intellectual property rights.

27. Moreover, the transaction was conditioned upon Loeb and Silver each signing and complying with a non-competition, non-solicitation and confidentiality agreement. Additionally,

10

pursuant to the express terms of the Asset Purchase Agreement, Loeb and Silver were required to

hold in confidence all trade secrets, know-how and other proprietary documents and information

related to the business and to refrain from using any such information for their own benefit or the

benefit of any third party so long as such information is not in the public domain.

28.     Specifically, the Asset Purchase Agreement states:

> After the closing, Seller and each Shareholder and each of their respective
> affiliates shall hold in confidence all trade secrets, know-how and other
> confidential or proprietary documents and information related to the Business,
> and shall refrain from disclosing or using any such confidential information for
> the benefit of Seller or any Shareholder and each of their respective affiliates, or
> to or for the benefit of any third party in each case...

> Seller and each Shareholder agree that during the period commencing on the
> Closing Date and ending on the fifth anniversary thereof (such period being
> hereinafter referred to as the "Restricted Period"), neither Seller nor any
> Shareholder shall, directly or indirectly, compete in any manner or capacity (*e.g.*,
> as an advisor, principal, agent, consultant, partner, member, joint venturer, officer,
> director, employee, equity holder, or otherwise) with (i) any phase of the Business
> as conducted by Seller or under active consideration by Seller prior to the Closing
> Date...

> During the Restricted Period, neither Seller nor any Shareholder shall (i) induce
> or attempt to induce any Offered Employee to leave the employ of Buyer or any
> of its Affiliates or in any way interfere adversely with the relationship between
> any such Offered Employee and Buyer or any of its Affiliates, (ii) induce or
> attempt to induce any Offered Employee to work for, render services or provide
> advice to or supply confidential business information or trade secrets of any such
> entity to any Person...or (v) directly or indirectly solicit, sell or render competing
> services or target any entity that competes with any phase of the Business as
> conducted by Seller or under active consideration by Seller prior to the Closing
> Date...

Portions of the Asset Purchase Agreement are attached hereto at Exhibit A.

29.     Pursuant to the terms of the non-competition, non-solicitation and confidentiality

agreements entered into by Loeb and Silver, each was precluded from competing with C.H.

Robinson, each was precluded from soliciting or inducing C.H. Robinson's employees to leave

C.H. Robinson for a similar period of time, each was precluded from utilizing or disclosing

11

proprietary information of C.H. Robinson and each was required to return all C. H. Robinson

property to C.H. Robinson.

30.    Specifically, Loeb's Agreement states:

> Upon termination of Executive's employment with Employer for any reason,
> Executive shall deliver promptly to Employer all records, manuals, books,
> …computer disks, computer software, computer programs (including source code,
> object code, on-line files, documentation…) …which are the property of
> Employer or which in any way relate to the business, products, practices or
> techniques of Employer, and all other property, trade secrets and confidential
> information of Employer….

> …Executive agrees that during the Restricted Period (as hereinafter defined),
> Executive shall not, directly or indirectly, engage in any "Competing Business
> Activity" (as hereinafter defined), in any manner or capacity, including but not
> limited to as an advisor, principal, agent, partner, officer, director, shareholder,
> employee, or member of any association.

> During the Restricted Period Executive shall not (a) induce or attempt to induce
> any employee of Employer to leave the employ of Employer or in any way
> interfere adversely with the relationship between any such employee and
> Employer; (b) induce or attempt to induce any employee of Employer to work for,
> render services to or provide advice to, or supply confidential business
> information or trade secrets of Employer to any third person, firm or
> corporation…

> Executive agrees that, during the Restricted Period, Executive will not, directly or
> indirectly, assist, solicit or encourage any other person in carrying out, directly or
> indirectly, any activity that would be prohibited by the provisions of this Section 7
> if such activity were carried out by Executive, either directly or indirectly; and in
> particular, Executive agrees that Executive will not, directly or indirectly, induce
> any employee of Employer to carry out, directly or indirectly, any such activity.

> …Executive agrees that during his employment and thereafter, Executive shall
> not disclose to a third party or use for his personal benefit Confidential
> Information of Employer….

Portions of Loeb's Agreement are attached hereto at Exhibit B.

31.    Loeb and Silver voluntarily left C.H. Robinson's employ on September 30, 2002

and December 29, 2000, respectively.

32.    In particular, by acquiring Backhaulers, C.H. Robinson acquired at great expense a proprietary software program called Express. The software was so advantageous to C.H. Robinson that following its acquisition, C.H. Robinson rolled out Express to all of C.H. Robinson's offices and locations.

33.    Harrison was instrumental in C.H. Robinson's integration of Express as well as further developing and enhancing Express for C.H. Robinson. Harrison was employed by C.H. Robinson from the December 16, 1999 purchase through April 1, 2002, when he voluntarily resigned. Harrison was Director of Technology for C.H. Robinson at the time of his resignation.

34.    In Harrison's position he had direct access to and worked directly with the Express software source code, object code and functionality. As such, Harrison was required to and did in fact receive training regarding confidentiality of company information and executed numerous agreements acknowledging the confidentiality of Backhaulers' and C.H. Robinson's proprietary information and software. Further, pursuant to the training acknowledgements, Harrison was required to keep confidential and not utilize C.H. Robinson's proprietary information.

35.    In March 2001, Harrison executed a Management-Employee Agreement with C.H. Robinson in exchange for his employment, participation in an Omnibus Stock Plan and other benefits. Pursuant to Harrison's Management-Employee Agreement he was prohibited for a period of two years after termination of his employment from competing against C.H. Robinson, engaging in competing business activity related to transportation, freight brokerage or logistics, and utilizing or disclosing confidential information and other information of C.H. Robinson. Harrison was also required to assign all right title and interest in all inventions to C.H. Robinson and was required to report to C.H. Robinson, each time he accepted new

13

employment, the identity and business of any new employer for two years following his

termination of employment from C.H. Robinson.

36.    Specifically, Harrison's Agreement states:

> Upon termination of Key Employee's employment with Employer for any reason,
> Key Employee shall deliver promptly to Employer all records, manuals, books,
> …computer disks, computer software, computer programs (including source code,
> object code, on-line files, documentation…) …which are the property of
> Employer or which in any way relate to the business, products, practices or
> techniques of Employer, and all other property, trade secrets and confidential
> information of Employer….

> …Key Employee agrees that during the Restricted Period (as hereinafter defined),
> Key Employee shall not, directly or indirectly, engage in any "Competing
> Business Activity" (as hereinafter defined), in any manner or capacity, including
> but not limited to as an advisor, principal, agent, consultant, partner, officer,
> director, shareholder, employee, or member of any association.

> During the Restricted Period Key Employee shall not (a) induce or attempt to
> induce any employee of Employer to leave the employ of Employer or in any way
> interfere adversely with the relationship between any such employee and
> Employer; (b) induce or attempt to induce any employee of Employer to work for,
> render services to or provide advice to, or supply confidential business
> information or trade secrets of Employer to any third person, firm or
> corporation…

> Key Employee agrees that, during the Restricted Period, Key Employee will not,
> directly or indirectly, assist, solicit or encourage any other person in carrying out,
> directly or indirectly, any activity that would be prohibited by the provisions of
> this Section 7 if such activity were carried out by Key Employee, either directly
> or indirectly; and in particular, Key Employee agrees that Key Employee will not,
> directly or indirectly, induce any employee of Employer to carry out, directly or
> indirectly, any such activity.

> …Key Employee agrees that during his employment and thereafter, Key
> Employee shall not disclose to a third party or use for his personal benefit
> Confidential Information of Employer….

Portions of Harrison's Agreement are attached hereto at Exhibit C.

37.    In February 2004, after Harrison had left C.H. Robinson, Harrison represented to

C.H. Robinson in writing, as he was required to do, that he was still working for his own

14

software company and that he was working on software for various applications, none of which were related to transportation or brokerage. Exhibit D.

## EXPRESS SOFTWARE

38. A significant portion of C.H. Robinson's decision to acquire Backhaulers and to pay millions of dollars for it was to obtain Backhaulers' Express software.

39. Express was developed over many years at a cost of millions of dollars by a team of programmers. Silver and Harrison played significant roles in the development of the source code, object code and functionality of Express in order to meet the needs of various managers and business leaders. Likewise, upon C.H. Robinson's purchase of Express, C.H. Robinson refined and further developed Express into the tremendously valuable tool that it is today.

40. Express is a proprietary software tool that literally puts the day-to-day operations, management, accounting, sales, performance and communication functions for C.H. Robinson on the desktops of each C.H. Robinson employee, in one form or another, across the country. The software is so advanced and so industry specific that it has the capability to grow as C.H. Robinson's business grows, monitor and calculate revenue splits, integrate several business units, manage thousands of freight deliveries and carriers simultaneously, automatically monitor customer relationships and orders, look for more efficient and economical ways to deliver freight and match carriers with freight, track sales calls, queries, driver contacts, customer contacts, mapping and claims management, to name a few of the features.

41. Hundreds of pieces of information can be viewed simultaneously or called up using specific keystrokes and shortcuts specific to Express. Further, Express has communication tools built-in which allow C.H. Robinson employees to communicate quickly and efficiently with anyone in the organization in the United States and elsewhere.

15

42.     The functionality of Express, including, but not limited to its unique matching feature, access to information, multiple use of information, automated functions, tracking features, keystrokes and shortcuts are unique to Express and are the result of years of development. These proprietary combinations of features and functions are carried out through the use of proprietary source code and object code which are unique to C.H. Robinson and developed over many years.

43.     A similar product could not be reproduced without years of development and/or access to C.H. Robinson's proprietary information, source code, object code, know-how and industry testing and experience.

44.     The Express software, source code and object code reside on C.H. Robinson's computer network. The network and its content are password protected as well as being the subject of confidentiality training and express security agreements.

## EVENTS GIVING RISE TO THIS ACTION

45.     In 2004, C.H. Robinson began to hear that Loeb and Silver had started or bought into a freight transportation and logistics business and intended to compete directly with C.H. Robinson. Consequently, C.H. Robinson began to investigate these rumors since it had paid substantial sums of money for Backhaulers and Loeb's and Silver's non-competition agreements. On January 18, 2005, C.H. Robinson became more concerned about Loeb's and Silver's activities when Ardell, a former trainer in C.H. Robinson's Chicago Central office, resigned and indicated to his managers that he was going to work for "Paul Loeb." One of Ardell's primary duties with C.H. Robinson had been training employees in the operation of the Express software.

46.     Shortly after Ardell's departure, Sherwood, who like Ardell was a former Backhaulers employee, resigned as manager of C.H. Robinson's Ann Arbor, Michigan branch and indicated that he was going to work for Loeb and his new company. In late 2004 and early

16

2005, Sherwood had exercised stock options which he held in C.H. Robinson. At that time, Sherwood denied that he was in negotiations with or planning to go to work for Loeb.

47.     Upon further investigation, C.H. Robinson uncovered a series of instant messenger e-mails revealing for the first time that Loeb was in active discussions with numerous C.H. Robinson employees. However, the communications were much more sinister than simple personal communications. In fact, the instant e-mails revealed numerous violations by Loeb of his ongoing obligations to C.H. Robinson.

48.     For example, the instant messaging revealed that, in July 2004, Loeb was inquiring about and discussing C.H. Robinson employee performance. In August 2004, Loeb solicited and discussed C.H. Robinson confidential information with Epstein regarding average loads handled per employee, terms, gross profit and pricing. In August 2004, Loeb engaged in discussions which indicated Loeb was going to employ Epstein. In November 2004, Loeb and Epstein engaged in a discussion indicating that Loeb was soliciting Epstein to join him and that there were 28 days to go on Loeb's non-competition agreement. In November 2004, Loeb again discussed with Epstein confidential information about commissions and load structure. And in December 2004, Loeb engaged in a lengthy discussion with a C.H. Robinson employee regarding C.H. Robinson's new proprietary Virtual Private Fleet concept.

49.     C.H. Robinson managers subsequently met with several of the individuals which it had determined were communicating with Loeb. Following the managers' meeting with Epstein, his employment with C.H. Robinson was terminated.

50.     During the managers' meeting with Berk, he indicated that he was unaware that the information he was supplying to Loeb was sensitive in nature or would prove advantageous to Loeb in a competing venture. He also indicated that he had not been offered employment by

17

Loeb or his company. Berk subsequently exercised all of his C.H. Robinson options and on May 20, 2005, resigned from C.H. Robinson. At the time of his resignation, Berk acknowledged that he had been in discussions with Loeb and Command for several months, and that he had in fact accepted a position at Command.

51.     More recently, C.H. Robinson discovered that Harrison was associated with Command as a software developer and that he was working closely with Loeb at Command on a software program called Slingshot.

52.     In particular, a former Command employee informed C.H. Robinson that Harrison and Loeb are utilizing a software program, on information and belief, developed by Harrison and Loeb, which is identical to C.H. Robinson's Express software. Specifically, the former Command employee indicated that he needed little if any training upon joining C.H. Robinson with regard to Express since the programs, characteristics, functionality, keystrokes and shortcuts were virtually identical.

53.     On information and belief, consistent with Defendants' improper acquisition of C.H. Robinson's Express software code and use of its proprietary information in Slingshot, Command recently hired Carlson, a C.H. Robinson Express software trainer. Because, on information and belief, the software programs are virtually identical, a C.H. Robinson Express software trainer would have little or no trouble training Command employees and/or agents to use Slingshot.

54.     On information and belief, and also consistent with Defendants' improper acquisition of C.H. Robinson's Express software code and use of its proprietary information in Slingshot, Command recently hired Broering, a C.H. Robinson Express software technician.

18

Because, on information and belief, the software programs are virtually identical, a C.H. Robinson Express software technician would have little or no trouble maintaining Slingshot.

55.     Despite the fact that C.H. Robinson paid Loeb and Silver millions of dollars for Backhaulers and Express, it now appears that the Defendants improperly retained, acquired or are utilizing, and have literally knocked off, C.H. Robinson's proprietary software and code.

56.     In light of the fact that Silver's post-employment agreements with C.H. Robinson remain in full force and effect and Harrison's and Loeb's only recently expired, and each of their confidentiality agreements remain in force, it is difficult to imagine that software which took years to build, teams of programmers to develop and took millions of dollars to create was created out of thin air in a few short months.

57.     Upon becoming employed by Backhaulers and C.H. Robinson, Harrison and Loeb were entrusted with proprietary business and software information. This information included, among other things: margin information, pricing, the identity of vendors, vendor pricing and relationship information, rate structures, marketing strategies, the identity of customers, customer transportation analysis information, software methodology information, customer contact information, container fleet information, detailed information about current customer requirements and preferences and purchase histories, source code, object code, software functionality and other information.

58.     C.H. Robinson's proprietary information is not generally known in the industry and is valuable because C.H. Robinson derives economic value from the information not being publicly available.

19

59.     C.H. Robinson's proprietary business, software and customer information is of great value to C.H. Robinson and such information would give any competitor who improperly acquired such information an unfair competitive advantage.

60.     C.H. Robinson protects its proprietary business and customer information by requiring employees to keep business, software and customer information confidential, by password protecting computers, by limiting access to information, by requiring employees to sign data security agreements, by requiring employees to sign a certificate of compliance and by requiring employees to review its Code of Ethics.

61.     C.H. Robinson's  customer relationships and goodwill are of paramount importance to C.H. Robinson in that many of C.H. Robinson's customers have been customers of C.H. Robinson for quite some time and hence, are long-term customers.  Moreover, in a number of instances, C.H. Robinson's customers entrust C.H. Robinson with confidential information and require C.H. Robinson to enter into confidentiality agreements as well.

62.     While employed by Backhaulers and C.H. Robinson, Harrison and Loeb had day-to-day contact with customers, vendors, and proprietary information.  Both were privy to the pricing structure, margins, methodologies, fees, vendor identities, customer identities, software, coding and strategies being utilized by C.H. Robinson and which would give Defendants an unfair advantage in creating software and building a competing business.

63.     Defendants' actions are a serious threat to C.H. Robinson's business, are in violation of contractual obligations and applicable law and unjustly enrich Defendants.

20

## COUNT I

### BREACH OF CONTRACT
### (Against Loeb and Harrison)

64.     C.H. Robinson hereby incorporates by reference the allegations contained in paragraphs 1 through 63.

65.     Harrison's and Loeb's Non-Competition Agreements and the Asset Purchase Agreement are valid and enforceable contracts. The post-employment activity covenants, confidentiality covenants and other provisions contained in the Agreements are reasonable in scope and duration and are reasonably necessary to protect legitimate protectable interests in the purchased assets, goodwill, long-term customer relationships, the work force and proprietary business and customer information.

66.     C.H. Robinson has fully performed all of its obligations under the Agreements.

67.     Harrison and Loeb are breaching or conspiring to breach each of their individual agreements including without limitation their employment agreements, non-competition agreements, data security agreements, confidentiality agreements, invention assignment of rights agreements, code of ethics and/or the Asset Purchase Agreement in at least one of the following ways by:

> A.     removing from, retaining, utilizing or failing to return C.H. Robinson's Express Software;
>
> B.     utilizing or disclosing Express software, as well as its proprietary source code, object code, functionality, appearance, database construction, operation, keystrokes and/or combination of features;
>
> C.     soliciting confidential information from C.H. Robinson employees;
>
> D.     utilizing or disclosing confidential information of C.H. Robinson;
>
> E.     soliciting C.H. Robinson employees to join Command or Loeb; and

21

F.    adversely interfering with the business of C.H. Robinson.

68.    C.H. Robinson has been damaged as a result of Defendants' individual actions or actions in concert with another person or entity.

## COUNT II

### ACTUAL AND THREATENED MISAPPROPRIATION OF TRADE SECRETS AND CONFIDENTIAL INFORMATION
### (Against All Defendants)

69.    C.H. Robinson hereby incorporates by reference the allegations contained in paragraphs 1 through 63.

70.    The proprietary business, software and customer information of C.H. Robinson constitute trade secrets because C.H. Robinson derives independent economic value from that information, such information is not generally known nor readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy.

71.    On information and belief, Defendants have actually misappropriated and/or threaten to inevitably misappropriate C.H. Robinson's trade secrets without C.H. Robinson's consent in violation of Illinois Trade Secrets Act. 765 ILCS 1065 *et seq.*

72.    Harrison and Loeb have become employed by or affiliated with Command or serve functions for Command similar to their previous roles at C.H. Robinson and thus, will inevitably utilize or disclose C.H. Robinson's trade secrets and/or confidential information.

73.    On information and belief, Defendants knew or had reason to know that information supplied to them, acted upon by them or forming the basis of their activities was acquired improperly or derived from persons having a duty to maintain the secrecy of such information.

22

74. Defendants have been and/or will be unjustly enriched by the misappropriation of C.H. Robinson's trade secrets and/or confidential information, and will continue to threaten to use, actually use, divulge, inevitably disclose, acquire and/or otherwise misappropriate C.H. Robinson's trade secrets and confidential information.

75. Upon information and belief, Defendants' misappropriation has been willful and malicious.

76. As a result of the misappropriation of C.H. Robinson's trade secrets, C.H. Robinson has been injured and/or Defendants have been individually or in concert with another unjustly enriched.

## COUNT III

### CONVERSION
### (Against All Defendants)

77. C.H. Robinson hereby incorporates by reference the allegations contained in paragraphs 1 through 63.

78. Defendants individually or in concert with another removed from C.H. Robinson and/or retained records, manuals, books, physical copies of Express and/or other non-trade secret property of C.H. Robinson without authorization, and converted said property to their own use.

79. C.H. Robinson has demanded from Defendants the return of its records, manuals, books, and other non-trade secret property, as well as the return of all physical copies of Express, through its Code of Ethics, training and Agreements.

80. Defendants have failed to return C.H. Robinson's property.

81. As a direct and proximate result of Defendants' actions individually or in concert with another, C.H. Robinson has been damaged.

23

82.     C.H. Robinson has suffered damages as a result of Defendants' actions in an amount to be determined at trial.   Because Defendants' actions have been willful, malicious, outrageous, oppressive and/or done in complete disregard of the consequences they might have upon C.H. Robinson, the award of exemplary and punitive damages in an amount to be proven at trial is proper.

## COUNT IV

### CONSTRUCTIVE TRUST
### (Against All Defendants)

83.     C.H. Robinson hereby incorporates by reference the allegations contained in paragraphs 1 through 63.

84.     Through the actions alleged herein, Defendants have improperly utilized C.H. Robinson's assets to acquire business.

85.     A constructive trust must be imposed over all assets and property of Command and/or Harrison and Loeb related to the matters alleged in this Complaint such as Slingshot, monies paid for the assets of Backhaulers, monies made by Defendants as a result of their improper actions alleged herein including, but not limited to use of Express, such that C.H. Robinson shall be the beneficiary of the trust imposed to protect assets and property which in fact rightfully belong to C.H. Robinson.

## COUNT V

### VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT
### 18 U.S.C. § 1030 ET SEQ.
### (Against Loeb and Harrison)

86.     C.H. Robinson hereby incorporates by reference the allegations contained in paragraphs 1 through 63.

24

87.    C.H. Robinson's computer system is a protected computer and network which is used across state lines in interstate commerce, has Internet access across state lines and was used to transfer C.H. Robinson information for sales in interstate commerce.

88.    Neither Harrison nor Loeb were authorized by C.H. Robinson to access its computer systems, access its computerized information, access software, access source code, access object code or continue to possess C.H. Robinson electronic files and data for their personal gain or that of a competitor and most certainly not after their voluntary resignation of employment from C.H. Robinson.

89.    Through these actions Harrison and Loeb have:

A.    intentionally accessed a computer system without authorization or exceeded their authority to obtain information from a protected computer in violation of 18 U.S.C. § 1030(a)(2)(C);

B.    knowingly and with intent to defraud, accessed a protected computer without authorization or exceeded their authority, and by means of such conduct furthered the intended fraud and obtained valuable information resulting in damages exceeding $5000.00 in violation of 18 U.S.C. § 1030(a)(4); or

C.    intentionally accessed a protected computer without authorization or exceeded their authority, and, as a result of such conduct, caused damage in violation of 18 U.S.C. § 1030(a)(5)(A)(iii).

90.    C.H. Robinson has suffered damages as a result of Harrison's and Loeb's actions in an amount to be determined at trial.

## COUNT VI

### COPYRIGHT INFRINGEMENT
### (Against All Defendants)

91.    C.H. Robinson hereby incorporates by reference the allegations contained in paragraphs 1 through 63.

CHI 10987943.1

92.     C.H. Robinson has created, designed and authored a number of computer software programs, including Express.

93.     C.H. Robinson has complied in all respects with the Copyright Act of 1976, 17 U.S.C. §101 et seq. ("Copyright Act"), and all laws governing copyrights, has secured the exclusive rights and privileges in and to its copyrights, and has received Certificates of Registration from the United States Register of Copyrights, Registration numbers TXu1-239-558, TXu1-239-559, TXu1-247-636, with respect to its computer software programs.  True and correct copies of the Certificates of Registration are attached hereto at Exhibit E.

94.     Defendants have infringed upon C.H. Robinson's copyrights by copying and/or reproducing the copyrighted works and/or preparing derivative works based upon the copyrighted works, in violation of C.H. Robinson's exclusive rights under the Copyright Act.

95.     Defendants infringing work, Slingshot, is substantially similar to and/or derived from C.H. Robinson's copyrighted works.  Upon information and belief, Defendants' acts of infringement are ongoing and Defendants continue to infringe upon C.H. Robinson's copyrights.

96.     Upon information and belief, Defendants' actions in violating C.H. Robinson's copyrights have been willful and intentional.

97.     C.H. Robinson will suffer irreparable harm unless Defendants and their officers, agents, and employees, as well as all persons acting in concert with Defendants, are restrained from engaging in any further acts of copyright infringement.

98.     C.H. Robinson has no adequate remedy at law and, if Defendants' activities are not enjoined, C.H. Robinson will continue to suffer irreparable harm and injury to its goodwill and reputation, as well as substantial monetary damage.

26

99.     In addition, Defendants have been unjustly enriched, in an amount currently unknown, as a result of their infringement upon C.H. Robinson's copyrights.  Accordingly, C.H. Robinson requests that Defendants be required to account for all said gains, profits and advantages derived from their infringement and pay same to C.H. Robinson, or in lieu thereof, C.H. Robinson recover such statutory damages, including willful damages and attorneys fees, as this Court shall determine to be proper and within the provisions of the Copyright Act.

27

## **PRAYER FOR RELIEF**

WHEREFORE, C.H. Robinson prays for the following relief:

A.    That C.H. Robinson be awarded all monies it paid to Loeb and others for the Express software;

B.    That C.H. Robinson be awarded compensatory damages it has suffered, in an amount to be proven at trial and in excess of $75,000;

C.    That C.H. Robinson be awarded punitive and/or exemplary damages for willful and malicious conduct;

D.    That C.H. Robinson be awarded attorney's fees and the costs of this action as permitted by statute and/or law;

E.    That Defendants disgorge all monies obtained as a result of the improper actions alleged herein;

F.    That Defendants be enjoined from utilizing Express, Slingshot or any software derived from Express or Slingshot;

G.    That a constructive trust be imposed as stated herein;

H.    That Defendants be permanently enjoined from infringing upon C.H. Robinson's copyrights;

I.    That Defendants be required to deliver to C.H. Robinson all software, documents, and other items that are infringing upon C.H. Robinson's copyrights;

J.    That Defendants be required to pay C.H. Robinson such damages C.H. Robinson has sustained as a result of Defendants infringement upon its copyrights;

28

K.    That Defendants be required to account for all gains, profits and advantages derived by Defendants from their infringement upon C.H. Robinson's copyrights and pay same to C.H. Robinson, or in lieu thereof, Defendants be required to pay such statutory damages, including willful damages, that this Court determines to be proper and within the provisions of the Copyright Act; and

L.    That C.H. Robinson be awarded such other and further relief as the Court deems equitable and just.

**C.H. Robinson Demands Trial By Jury.**

Respectfully submitted,

C.H. ROBINSON WORLDWIDE, INC.

By: _____

One of Its Attorneys

Michael D. Wexler
J. Scott Humphrey
SEYFARTH SHAW LLP
55 East Monroe Street
Suite 4200
Chicago, Illinois 60603
(312) 346-8000
Attorneys for Plaintiff

29

## CERTIFICATE OF SERVICE

J. Scott Humphrey, an attorney, certifies that he caused a true and correct copy of the

foregoing Second Amended Complaint to be served via U.S. Mail upon the following:

Stephen Fedo
William J. Tarnow
Neal Gerber & Eisenberg LLP
2 North LaSalle Street – Suite 2200
Chicago, IL 60602

Mitchell L Marinello
Joseph Nacca
Novack and Macey LLP
303 West Madison Street – Suite 1500
Chicago, IL 60606

this 6th day of November, 2005.

_____
J. Scott Humphrey

**A**



6.03 <u>Conditions</u>. Seller and each Shareholder shall take all commercially reasonable actions necessary or desirable to cause the conditions set forth in Section 8.01 to be satisfied and to consummate the transactions contemplated herein in accordance with the terms of this Agreement, and neither Seller nor any Shareholder shall take any action that would impede, in any material respect, the Closing.

6.04 <u>No Negotiations etc.</u> Neither Seller nor any Shareholder shall, directly or indirectly, through any officer, director, agent or otherwise, solicit or encourage submission of any proposal or offer from any Person (including any of his officers, employees or agents) relating to any liquidation, dissolution, recapitalization, merger, consolidation or acquisition or purchase by such Person of all or a material portion of the Assets or the Business, or all or substantially all of the equity interest in Seller or other similar transaction or business combination involving Seller, the Assets or the Business, or participate in any negotiations regarding, or furnish to any other Person any information with respect to, or otherwise cooperate in any way with, or assist or participate in, facilitate or encourage, any effort or attempt by any other Person to do or seek any of the foregoing.

6.05 <u>Approvals and Consents</u>. Seller and the Shareholders shall, at Seller's cost, endeavor to obtain all consents and approvals of Governmental Entities or other third parties required for Seller and the Shareholders to carry out the transactions contemplated by this Agreement, including the HSR Act and any consents or approvals required under the Assumed Contracts and will cooperate with Buyer to obtain all such approvals and consents required of Buyer; <u>provided, however,</u> that (a) in accordance with Section 7.02, Buyer shall pay the filing fee payable in connection with its filing under the HSR Act and (b) the parties acknowledge and agree that neither Seller nor the Shareholders shall be required to pay any material amount to such other third party to obtain such consent.

6.06 <u>Closing Certificates</u>. Seller and each Shareholder will use its or their commercially reasonable efforts to deliver at the Closing all opinions, certificates and other documents required to be delivered by it at the Closing.

6.07 <u>Confidentiality</u>. After the Closing, Seller and each Shareholder and each of their respective affiliates shall hold in confidence all trade secrets, know-how and other confidential or proprietary documents and information related to the Business, and shall refrain from disclosing or using any such confidential information for the benefit of Seller or any Shareholder and each of their respective affiliates, or to or for the benefit of any third party in each case, except (a) in connection with this Agreement and (b) in connection with any legal proceeding, interrogatory, subpoena, civil investigative demand or similar process, to the extent Seller or a Shareholder has given Buyer reasonable notice thereof to allow Buyer to defend or seek a protective order in connection with such disclosure. This obligation of confidentiality and non-use shall not apply, or shall cease to apply, to such information which is in the public domain as of the Closing Date or subsequently comes into the public domain through a source other than Seller or any Shareholder or any of their respective affiliates.

6.08    Benefit Plans.  Seller shall take all action necessary or required (i) to terminate or amend, if requested by Buyer, all qualified retirement and welfare benefit plans and all non-qualified benefit plans and compensation arrangements that relate primarily to the Offered Employees, as of the Closing Date and (ii) to submit application to the IRS for a favorable determination letter for each of the Plans that is subject to the qualification requirements of Section 401(a) of the Code prior to the Closing.

6.09    Noncompetition Agreement.

(a)    Seller and each Shareholder agree that during the period commencing on the Closing Date and ending on the fifth anniversary thereof (such period being hereinafter referred to as the "Restricted Period"), neither Seller nor any Shareholder shall, directly or indirectly, compete in any manner or capacity (e.g., as an advisor, principal, agent, consultant, partner, member, joint venturer, officer, director, employee, equity holder, lender, or otherwise) with (i) any phase of the Business as conducted by Seller or under active consideration by Seller prior to the Closing Date or (ii) any phase of the business conducted by Parent and its Affiliates or under active consideration by Parent or its Affiliates prior to the Closing Date all of which are set forth under the caption referencing this Section 6.09 on the Buyer's Disclosure Schedule.

(b)    Geographic Extent of Covenant.  The obligations of Seller and each Shareholder under this Section 6.09 shall apply to any geographic area in which Seller (i) has engaged in business prior to the consummation of the transactions contemplated by this Agreement through the providing of its services, promotional, sales or marketing activity or otherwise or (ii) has otherwise established its goodwill, business reputation or any customer or supplier relations.

(c)    Limitations of Covenant.  Notwithstanding any provision in this Section 6.09 to the contrary, Seller and the Shareholders shall be entitled, and none shall be deemed to have violated any provision of this Section 6.09, solely as a result of (i) ownership by Seller or the Shareholders, as a passive investment, of less than 5% in the aggregate of the outstanding shares of capital stock or other equity interest of any corporation listed on a national securities exchange or publicly traded on an automated quotation system, (ii) ownership by Seller or the Shareholders of capital stock or other securities of Parent or Buyer (regardless of the level of such ownership), (iii) service by PLL as an officer or director of any corporation listed on a national securities exchange or publicly traded on an automated quotation system, so long as (x) the operations of such corporation and its Affiliates only incidentally compete with Parent and its Affiliates and (y) PLL renders no services to such incidentally competing operations, (iv) PLL writing a letters of recommendation for former employees of Seller, so long as such letters address only employment while working for Seller, (v) hiring any Offered Employee who has been terminated by Buyer or its Affiliates without "cause" (as defined in the Employment Agreements) or who terminates their employment with Buyer or its Affiliates for "good reason" (as defined in the Employment Agreements) or (vi) engaging in a business which incidentally

34

serves a competing business, so long as such services do not in and of themselves constitute a breach of this Section 6.09 and such services are not targeted at such competing business.

(d)    No Solicitation. During the Restricted Period, neither Seller nor any Shareholder shall (i) induce or attempt to induce any Offered Employee to leave the employ of Buyer or any of its Affiliates or in any way interfere adversely with the relationship between any such Offered Employee and Buyer or any of its Affiliates, (ii) induce or attempt to induce any Offered Employee to work for, render services or provide advice to or supply confidential business information or trade secrets of any such entity to any Person, (iii) employ, or otherwise pay for services rendered by, any Offered Employee in any business enterprise with which Seller or any Shareholder may be associated, connected or affiliated, (iv) induce or attempt to induce any customer, supplier, licensee, licensor or other business relation of Seller prior to the consummation of the transactions contemplated by this Agreement to cease doing business with Buyer or any of its Affiliates or in any way interfere with the relationship between any such customer, supplier, licensee, licensor or other business relation and Buyer or (v) directly or indirectly solicit, sell or render competing services or target any entity that competes with any phase of the Business as conducted by Seller or under active consideration by Seller prior to the Closing Date. For the purposes of this Agreement, the term "Affiliate" shall mean an individual, partnership, limited liability company, corporation, joint venture or other entity (each a "Person") that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with the Person specified (for the purposes of this definition, control and all permutations thereof, means the ability of a Person to, directly or indirectly, direct the business and affairs of such Person, whether through the ownership of voting securities, by contract or otherwise). Within ten days of a request by Seller or any Shareholder, Buyer will identify those Persons who are its Affiliates.

(e)    Indirect Competition. Neither Seller nor any Shareholder shall, directly or indirectly, assist or encourage any other Person in carrying out, directly or indirectly, any activity that would be prohibited by this Section 6.09, if such activity were carried out by Seller or any Shareholder, either directly or indirectly. In particular, but without limiting the generality of the foregoing, Seller and each Shareholder agree that they will not, directly or indirectly, induce any Offered Employee to carry out, directly or indirectly, any such activity.

(f)    Acknowledgment. Seller and each Shareholder agrees that (i) the restrictions and agreements contained in this Section 6.09 are a material inducement to Buyer and Parent entering into this Agreement and are reasonable and necessary to protect the legitimate interests of Buyer and (ii) any violation of this Section 6.09 will cause substantial and irreparable harm to Buyer that would not be quantifiable and for which no adequate remedy would exist at law. Accordingly, without limiting the remedies available to Buyer, injunctive relief shall be available for any violation of this Section 6.09.

(g)    Blue Pencil Doctrine. If the duration or geographical extent of, or business activities covered by, this Section 6.09 are in excess of what is valid and enforceable

35

**B**

Section 4.04 of this Agreement. EXECUTIVE shall not be entitled to receive any further compensation under the provisions of this Agreement after the effective date of such termination.

     B.    If EMPLOYER terminates EXECUTIVE's employment without cause under Section 6.03, or if EXECUTIVE terminates his employment under Section 6.04.B, EXECUTIVE will be paid as severance pay an amount equal to EXECUTIVE's annual base salary on the termination date, computed on a monthly basis, multiplied by twelve (12) months. EXECUTIVE shall only be entitled to such severance pay if EXECUTIVE signs and then does not rescind a general release of employment-related claims in a form acceptable to EMPLOYER. If EXECUTIVE does not sign, or signs but then rescinds such a general release of claims, EXECUTIVE shall not be entitled to receive any of the compensation he may otherwise be entitled to receive under this Section 6.05.B. Any severance payment made under this Section 6.05.B will be paid according to EMPLOYER's normal payroll schedule. During the period EXECUTIVE is receiving severance pay under this Section 6.05.B, he will have no duty to obtain employment or otherwise mitigate his wages. If EXECUTIVE does earn any income during that period, it will not reduce the amount of severance pay he receives.

     Notwithstanding any other provision in this Agreement, should EXECUTIVE's employment be terminated for any reason, he will not earn and will have no right to receive any compensation except as expressly provided in this Agreement or in the terms and conditions of a compensation plan or program expressly referenced herein.

     C.    Notwithstanding any termination of EXECUTIVE's employment with EMPLOYER, EXECUTIVE, in consideration of EXECUTIVE's employment hereunder to the date of such termination, shall remain bound by the provisions of this Agreement which specifically relate to periods, activities or obligations upon or subsequent to the termination of EXECUTIVE's employment, including, but not limited to, the covenants contained in Section 7 hereof.

    6.06    Surrender of Records and Property. Upon termination of EXECUTIVE's employment with EMPLOYER for any reason, EXECUTIVE shall deliver promptly to EMPLOYER all records, manuals, books, blank forms, documents, letters, memoranda, notes, notebooks, reports, computer disks, computer software, computer programs (including source code, object code, on-line files, documentation, testing materials and plans and reports) designs, drawings, formulae, data, tables or calculations or copies thereof, which are the property of EMPLOYER or which relate in any way to the business, products, practices or techniques of EMPLOYER, and all other property, trade secrets and confidential information of EMPLOYER, including, but not limited to, all tangible, written, graphical, machine readable and other materials (including all copies) which in whole or in part contain any trade secrets or confidential information of EMPLOYER which in any of these cases are in EXECUTIVE's possession or under EXECUTIVE's control.

6

7.    Restrictive Covenants.

    7.01    Noncompetition.  In consideration of EMPLOYER's hiring of EXECUTIVE, EXECUTIVE's employment hereunder, and the significant financial benefits EXECUTIVE will receive if the Transaction is consummated, EXECUTIVE agrees that, during the "Restricted Period" (as hereinafter defined), EXECUTIVE shall not, directly or indirectly, engage in any "Competing Business Activity" (as hereinafter defined), in any manner or capacity, including but not limited to as an advisor, principal, agent, partner, officer, director, shareholder, employee, or member of any association.

        (i)    Geographical Extent of Covenant.  Because EMPLOYER's business operates on a world-wide basis, the obligations of EXECUTIVE under this Section 7 shall apply anywhere in North America.

        (ii)    Limitation on Covenant.  Ownership by EXECUTIVE, as a passive investment, of less than five percent of the outstanding shares of capital stock of any corporation listed on a national securities exchange or publicly traded in the over-the-counter market shall not constitute a breach of this Section 7.01.

        (iii)    Competing Business Activity.  As used in this Section 7.01, "Competing Business Activity" shall mean any business activities that are competitive with the business conducted by EMPLOYER at or prior to the date of the termination of EXECUTIVE's employment, including, but not limited to:

            (a)    freight contracting, freight brokerage, contract logistics, freight forwarding or backhauling, or custom house brokerage business;  or

            (b)    any activities that are carried out by a business that that competes directly or indirectly with EMPLOYER in the contracting, arranging, providing, procuring, furnishing or soliciting of distributors, freight contracting, freight brokerage, contract logistics, freight forwarding or backhauling, custom house brokerage or transportation services, or

            (c)    any activity conducted by a business engaged in the transportation or logistics industries as a shipper, receiver or carrier.

    7.02    Nonsolicitation, Non-hire and Noninterference.  During the Restricted Period, EXECUTIVE shall not (a) induce or attempt to induce any employee of EMPLOYER to leave the employ of EMPLOYER, or in any way interfere adversely with the relationship between any such employee and EMPLOYER; (b) induce or attempt to induce any employee of EMPLOYER to work for, render services to, provide advice to, or supply confidential business information or trade secrets of EMPLOYER to any third person, firm or corporation; (c) employ, or otherwise pay for services rendered by, any employee of EMPLOYER in any business enterprise with which EXECUTIVE may be associated, connected or affiliated; or (d) induce or attempt to

7

FEB 11 2005 09:33 FR C ROBINSON-LEGAL   952 937 7840 TO 9 22698869   P.09/28

induce any customer, supplier, licensee, licensor or other business relation of EMPLOYER to cease doing business with EMPLOYER, or in any way interfere with the then existing business relationship between any such customer, supplier, licensee, licensor or other business relation and EMPLOYER.

7.03. <u>Indirect Competition or Solicitation</u>. EXECUTIVE agrees that, during the Restricted Period, EXECUTIVE will not, directly or indirectly, assist, solicit or encourage any other person in carrying out, directly or indirectly, any activity that would be prohibited by the provisions of this Section 7 if such activity were carried out by EXECUTIVE, either directly or indirectly; and, in particular, EXECUTIVE agrees that EXECUTIVE will not, directly or indirectly, induce any employee of EMPLOYER to carry out, directly or indirectly, any such activity.

7.04. <u>Notification of Employment</u>. If at any time during the Restricted Period EXECUTIVE accepts new employment or becomes affiliated with a third party, EXECUTIVE shall immediately notify EMPLOYER of the identity and business of the new EMPLOYER or affiliation. Without limiting the foregoing, EXECUTIVE'S obligation to give notice under this Section 7.04 shall apply to any business ventures in which EXECUTIVE proposes to engage, even if not with a third-party EMPLOYER (such as, without limitation, a joint venture, partnership or sole proprietorship). EXECUTIVE hereby consents to EMPLOYER notifying any such new EMPLOYER or business venture of the terms of the covenants in this Section 7.04.

7.05 <u>Restricted Period</u>. As used in this Section 7, "Restricted Period" shall mean for the period between the Effective Date and two (2) years after the termination of EXECUTIVE'S employment with EMPLOYER for any reason (whether such termination is occasioned by EXECUTIVE or EMPLOYER).

8. <u>Confidential Information</u>. In consideration for EMPLOYER's promises under this Agreement and because EXECUTIVE's duties as a senior management employee will necessitate his having access to and being entrusted with confidential and proprietary information relating to EMPLOYER's business and customers, EXECUTIVE agrees that during his employment with EMPLOYER and thereafter, EXECUTIVE shall not disclose to a third party or use for his personal benefit Confidential Information of EMPLOYER. "Confidential Information" means all information written (or generated/stored on magnetic, digital, photographic or other media) or oral, relating to any aspect of EMPLOYER's existing business or future strategic or business plans which is disclosed to EXECUTIVE or conceived, discovered or developed by EXECUTIVE, and which is not generally known or proprietary to EMPLOYER. Confidential Information includes, without limitation, EMPLOYER's strategic and other business plans, designs, customers, suppliers, and EMPLOYER's marketing, accounting, merchandising, and information-gathering techniques and methods, and all accumulated data, listings, or similar recorded matter used or useful in food sales, freight contracting and freight forwarding and backhauling (all modes), and customs house brokerage operations, including but not limited to the customer and carrier lists, business forms, weekly loading lists, service contracts, all pricing information, computer programs, tariff information and marketing aids.

8

All information disclosed to EXECUTIVE or to which EXECUTIVE has access during the period of this employment, for which there is any reasonable basis to believe is, or which appears to be treated by EMPLOYER as Confidential Information, shall be presumed to be Confidential Information under this Agreement. In addition, EXECUTIVE shall comply with the terms of any Confidentiality Agreement by which EMPLOYER is bound to a third party.

9.    Inventions.

9.01    EXECUTIVE agrees that his services on behalf of EMPLOYER are works made for hire and EXECUTIVE shall communicate to EMPLOYER as promptly and fully as practicable all Inventions (as defined below) which are (or were) conceived or reduced to practice by Executive (alone or jointly with others) during EXECUTIVE'S employment with EMPLOYER. All such Inventions shall be the sole property of EMPLOYER and its assigns, and EMPLOYER and its assigns shall be the sole owner of all patents, copyrights, trademarks, trade secrets, and other rights and protections in connection therewith. EXECUTIVE hereby assigns to EMPLOYER and/or its nominees, all of EXECUTIVE'S right, title, and interest in such Inventions, and all of EXECUTIVE'S right, title, and interest in any patents, copyrights, patent applications or copyright applications based thereon.

In addition, EXECUTIVE shall communicate to EMPLOYER as promptly and fully as practicable all Inventions (as defined below) which are (or were) conceived or reduced to practice by Executive (alone or jointly with others) within one (1) year following the termination of EXECUTIVE'S employment with EMPLOYER for any reason (and whether occasioned by EXECUTIVE or EMPLOYER).

EMPLOYER agrees to indemnify and hold harmless EXECUTIVE from any liability or cost (including reasonable attorneys' fees) relating to a claim of use, misuse or infringement alleged against EXECUTIVE by a third party concerning any Invention.

9.02    As used in this Section, the term "Invention" means all inventions, discoveries, improvements, processes, developments, designs, know-how, data, computer programs and formulae, which reasonably relate to EMPLOYER's business or result from duties EXECUTIVE performs for EMPLOYER, or result from use of any premises or property owned, leased, licensed or contracted for by EMPLOYER, whether patentable or unpatentable or protectable by copyright or other intellectual property law.

9.03    Any provision in this Section requiring EXECUTIVE to assign EXECUTIVE's rights in any Invention does not apply to an Invention which qualifies for exclusion under the provisions of Minnesota Statute § 181.78. That section provides that the requirement to assign "does not apply to an invention for which no equipment, supplies, facility or trade secret information of the employer was used and which was developed entirely on the employee's own time, and (1) which does not relate (a) directly to the business of the employer or (b) to the employer's actual or demonstrably anticipated research or development, or (2) which does not result from any work performed by the employee for the employer." EXECUTIVE understands

9

# C

services immediately, provided that during such 15-day notice period, Key Employee shall be entitled to earn and be paid his base salary.

### 6.05    Effect of and Compensation Upon Termination.

A.    During the Term, if (i) Key Employee's employment terminates due to Key Employee's death or total disability, or (ii) Employer terminates Key Employee's employment with cause in accordance with Section 6.02, or (iii) Employer terminates Key Employee's employment without cause under Section 6.03, or (iv) Key Employee voluntarily terminates his employment under Section 6.04, Key Employee shall not be entitled to receive any further compensation under the provisions of this Agreement after the effective date of such termination.

B.    Key Employee shall only be entitled to continued option vesting, or extended exercise period, as such is described in an option grant, if Key Employee signs and then does not rescind a general release of claims in a form acceptable to Employer.  If Key Employee does not sign, or signs but then rescinds such a general release of claims, Key Employee shall not be entitled to continued option vesting, or extended exercise period, as such is described in an option grant.

Notwithstanding any other provision in this Agreement, should Key Employee's employment be terminated for any reason, he will not earn and will have no right to receive any compensation except as expressly provided in this Agreement or in the terms and conditions of a compensation plan or program expressly referenced herein.

C.    Notwithstanding any termination of Key Employee's employment with Employer, Key Employee, in consideration of Key Employee's employment hereunder to the date of such termination, shall remain bound by the provisions of this Agreement which specifically relate to periods, activities or obligations upon or subsequent to the termination of Key Employee's employment, including, but not limited to, the covenants contained in Section 7 hereof.

### 6.06    Surrender of Records and Property.  Upon termination of Key Employee's employment with Employer for any reason, Key Employee shall deliver promptly to Employer all records, manuals, books, blank forms, documents, letters, memoranda, notes, notebooks, reports, computer disks, computer software, computer programs (including source code, object code, on-line files, documentation, testing materials and plans and reports) designs, drawings, formulae, data, tables or calculations or copies thereof, which are the property of Employer or which relate in any way to the business, products, practices or techniques of Employer, and all other property, trade secrets and confidential information of Employer, including, but not limited to, all tangible,

written, graphical, machine readable and other materials (including all copies) which in whole or in part contain any trade secrets or confidential information of employer which in any of these cases are in Key Employee's possession or under Key Employee's control.

7. Restrictive Covenants.

7.01 Noncompetition. In consideration of Employer's hiring of Key Employee, Key Employee's employment hereunder, and the significant financial benefits Key Employee will receive under the Employees' 1997 Omnibus Stock Plan, and any successor plans, Key Employee agrees that, during the "Restricted Period" (as hereinafter defined), Key Employee shall not, directly or indirectly, engage in any "Competing Business Activity" (as hereinafter defined), in any manner or capacity, including but not limited to as an advisor, principal, agent, consultant, partner, officer, director, shareholder, employee, or member of any association.

(i) Geographical Extent of Covenant. Because Employer's business operates on a world-wide basis, the obligations of Key Employee under this Section 7 shall apply anywhere in North America.

(ii) Limitation on Covenant. Ownership by Key Employee, as a passive investment, of less than five percent of the outstanding shares of capital stock of any corporation listed on a national securities exchange or publicly traded in the over-the-counter market shall not constitute a breach of this Section 7.01.

(iii) Competing Business Activity. As used in this Section 7.01, "Competing Business Activity" shall mean any business activities that are competitive with the business conducted by Employer at or prior to the date of the termination of Key Employee's employment, or any perspective business activity or relationship of which Key Employee was aware prior to termination, including, but not limited to:

(a) freight contracting, freight brokerage, contract logistics, freight forwarding or backhauling, or custom house brokerage business; or

(b) any activities that are carried out by a business that competes directly or indirectly with Employer in the contracting, arranging, providing, procuring, furnishing or soliciting of distributors, freight contracting, freight brokerage, contract logistics, freight forwarding or backhauling, custom house brokerage or transportation services, or

(c) any activity conducted by a business engaged in the transportation or logistics industries as a shipper, receiver or carrier.

7.02   Nonsolicitation, Non-hire and Noninterference.  During the Restricted Period, Key Employee shall not (a) induce or attempt to induce any employee of Employer to leave the employ of Employer, or in any way interfere adversely with the relationship between any such employee and Employer; (b) induce or attempt to induce any employee of Employer to work for, render services to, provide advice to, or supply confidential business information or trade secrets of Employer to any third person, firm or corporation; (c) employ, or otherwise pay for services rendered by, any employee of Employer in any business enterprise with which Key Employee may be associated, connected or affiliated; or (d) induce or attempt to induce any customer, supplier, licensee, licensor or other business relation of Employer to cease doing business with Employer, or in any way interfere with the then existing business relationship between any such customer, supplier, licensee, licensor or other business relation and Employer.

7.03   Indirect Competition or Solicitation.  Key Employee agrees that, during the Restricted Period, Key Employee will not, directly or indirectly, assist, solicit or encourage any other person in carrying out, directly or indirectly, any activity that would be prohibited by the provisions of this Section 7 if such activity were carried out by Key Employee, either directly or indirectly; and, in particular, Key Employee agrees that Key Employee will not, directly or indirectly, induce any employee of Employer to carry out, directly or indirectly, any such activity.

7.04   Notification of Employment.  If at any time during the Restricted Period Key Employee accepts new employment or becomes affiliated with a third party, Key Employee shall immediately notify Employer of the identity and business of the new Employer or affiliation.  Without limiting the foregoing, Key Employee's obligation to give notice under this Section 7.04 shall apply to any business ventures in which Key Employee proposes to engage, even if not with a third-party Employer (such as, without limitation, a joint venture, partnership or sole proprietorship).  Key Employee hereby consents to Employer notifying any such new Employer or business venture of the terms of the covenants in this Section 7.04.

7.05   Restricted Period.  As used in this Section 7, "Restricted Period" shall mean for the period between the Effective Date and two (2) years after the termination of Key Employee's employment with Employer for any reason (whether such termination is occasioned by Key Employee or Employer).

7.06   Set-Off Right.  In the event Key Employee breaches any of the covenants set forth in this Section 7 or in Section 8, Key Employee acknowledges and agrees that Employer may set-off any loss, cost, damage, liability or expense (including, without limitation, lost profits and reasonable attorney's fees and expenses) against amounts otherwise payable under this

Agreement or any other agreement between Employer and its affiliates and Key Employee. Neither the exercise of nor failure to exercise such right of set-off or to give notice of a claim therefor will constitute an election of remedies or limit Employer in any manner in the enforcement of any other remedies available to it.

8.    Confidential Information. In consideration for Employer's promises under this Agreement and because Key Employee's duties as a senior management employee will necessitate his having access to and being entrusted with confidential and proprietary information relating to Employer's business and customers, Key Employee agrees that during his employment with Employer and thereafter, Key Employee shall not disclose to a third party or use for his personal benefit Confidential Information of Employer. "Confidential Information" means all information written (or generated/stored on magnetic, digital, photographic or other media) or oral, relating to any aspect of Employer's existing or reasonably foreseeable business which is disclosed to Key Employee or conceived, discovered or developed by Key Employee, and which is not generally known or proprietary to Employer. Confidential Information includes, without limitation, Employer's strategic and other business plans, designs, customers, suppliers, and Employer's marketing, accounting, merchandising, and information-gathering techniques and methods, and all accumulated data, listings, or similar recorded matter used or useful in food sales, freight contracting and freight forwarding and backhauling (all modes), and customs house brokerage operations, including but not limited to the customer and carrier lists, business forms, weekly loading lists, service contracts, all pricing information, computer programs, tariff information and marketing aids.

All Information disclosed to Key Employee or to which Key Employee has access during the period of this employment, for which there is any reasonable basis to believe is, or which appears to be treated by Employer as Confidential Information, shall be presumed to be Confidential Information under this Agreement. In addition, Key Employee shall comply with the terms of any Confidentiality Agreement by which Employer is bound to a third party. Key Employee's disclosure to attorneys, accountants and other advisors at the Employer's request, or in the performance of Key Employee's duties, shall not be treated as a violation of this Agreement.

9.    Inventions.

9.01    Key Employee shall communicate to Employer as promptly and fully as practicable all Inventions (as defined below) which are (or were) conceived or reduced to practice by Key Employee (alone or jointly with others) (1) during Key Employee's employment with Employer, (2) within one (1) year following the termination of Key Employee's employment with Employer for any reason (and whether occasioned by Key Employee or Employer). Key Employee hereby assigns to Employer and/or its nominees, all of Key Employee's right, title, and interest in such Inventions, and all of Key Employee's right, title, and

# D

# HARRISON SOFTWARE, INC.

Tools For IT

www.harrisonsoftware.com

Troy Renner
C.H. Robinson
8100 Mitchell Road
Eden Prairie, MN 55344
(952) 937-8500
(952) 937-7781 (fax)

Thursday, February 03, 2004

Troy,
As per our conversation earlier today, I am writing this to satisfy section 7.04 of my
Management-Employee Agreement.

I currently work for Harrison Software, Inc., a chapter S corporation of which I own
80%, and Deborah Lassa (my girlfriend) owns 20%. The purpose of the company is to
develop software tools for IT departments. The current project is called FiMMS (for File
Movement and Monitoring System). This product is designed to assist in moving data
around computer networks (replacing scripting that companies may currently use), and
more importantly, monitoring the flow of data and notifying system administrators should
the movement of data fail, or levels of transactions fall below or rise above
predetermined thresholds. Unfortunately, the first version of the product that was
developed was far too complicated to install and use. I have recently begun a complete
rewrite of the product, and hope to have a beta version available in late March or early
April.

We also have plans on bringing to market a few other projects, including a change
management system to help IT departments in controlling the changes to systems and
software.

An area of business that we are looking at pursuing (but have not made any solid moves
to yet) is in helping small and midsized business with their IT operations. Many small
companies do not have the resources or skills to keep their systems up to date, virus free
and running smoothly. From that, we would expect to open the door to custom
programming for these businesses. However, given the terms of my Management-
Employee Agreement, if we were to pursue this business, we would stay away from any
transportation / brokerage type companies until the expiration of the agreement.

Please note, that everything above is the same as it was when I left CH Robinson, except
for having incorporated. I believe my initial resignation letter to CHR included what I
was planning on doing, thus satisfying the original requirements of section 7.04 at that
time.

9933 Lawler Avenue, Suite 518, Skokie, IL 60077
847-679-7201

**E**

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America



**Form TX**
For a Nondramatic Literary Work
UNITED STATES COPYRIGHT OFFICE

**TXu 1 – 239 – 558**



EFFECTIVE DATE OF REGISTRATION

08    08    2005
Month   Day   Year

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

## 1

**TITLE OF THIS WORK ▼**
EXPRESS (2005)

**PREVIOUS OR ALTERNATIVE TITLES ▼**
EXPRESS (1999)

**PUBLICATION AS A CONTRIBUTION** If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared.    **Title of Collective Work ▼**

If published in a periodical or serial give: **Volume ▼**    **Number ▼**    **Issue Date ▼**    **On Pages ▼**

## 2

**a** **NAME OF AUTHOR ▼**
CH Robinson Worldwide, Inc.

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☑ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶
{ Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?   ☐ Yes  ☐ No
Pseudonymous?   ☐ Yes  ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NOTE**

Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼
computer program

**b** **NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶
{ Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?   ☐ Yes  ☐ No
Pseudonymous?   ☐ Yes  ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

**c** **NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶
{ Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?   ☐ Yes  ☐ No
Pseudonymous?   ☐ Yes  ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

## 3

**a** **YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED**    This information must be given     ◀Year  in all cases.
2005

**b** **DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK**
Complete this information     Month ▶     Day ▶     Year ▶
ONLY if this work has been published.
◀ Nation

## 4

**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2. ▼

CH Robinson Worldwide, Inc.
8100 Mitchell Road
Eden Prairie, MN 55344

**TRANSFER** If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

**APPLICATION RECEIVED**
AUG 08 2005
**ONE DEPOSIT RECEIVED**
AUG 08 2005
**TWO DEPOSITS RECEIVED**

**FUNDS RECEIVED**

DO NOT WRITE HERE   OFFICE USE ONLY

---

**MORE ON BACK ▶** • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.    **DO NOT WRITE HERE**
• See detailed instructions.    • Sign the form at line 8.    Page 1 of 2 pages

*Added by C.O. Authority of Jeffrey Brown from
phone call on 08/16/2005

| EXAMINED BY | *j̶b̶e̶* | FORM TX |
|---|---|---|
| CHECKED BY | | |
| ☐ CORRESPONDENCE ☐ Yes | | FOR COPYRIGHT OFFICE USE ONLY |

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
☑ Yes ☐ No If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼
a. ☐ This is the first published edition of a work previously registered in unpublished form.
b. ☐ This is the first application submitted by this author as copyright claimant.
c. ☑ This is a changed version of the work, as shown by space 6 on this application.
If your answer is "Yes," give: Previous Registration Number ▶ concurrent application pending  Year of Registration ▶

**5**

**DERIVATIVE WORK OR COMPILATION**
Preexisting Material Identify any preexisting work or works that this work is based on or incorporates. ▼

Express (1999)

**a**

Material Added to This Work Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

Additions of new material and revisions to computer program

**b**

**6**
See instructions before completing this space.

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
Name ▼                            Account Number ▼

**a**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent. Name/Address/Apt/City/State/ZIP ▼

Jeffrey H. Brown
Seyfarth Shaw LLP
55 East Monroe Street, Suite 4200, Chicago, IL 60603

Area code and daytime telephone number ▶ 312.781.8604        Fax number ▶ 312.269.8869
Email ▶  jbrown@seyfarth.com

**b**

**7**

**CERTIFICATION*** I, the undersigned, hereby certify that I am the
Check only one ▶
☑ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☐ authorized agent of _____
Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made
by me in this application are correct to the best of my knowledge.

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.

CHAD LINDBLOOM          VP + CFO          Date ▶ 7/25/05

Handwritten signature (X) ▼

X _____

**8**

| Certificate will be mailed in window envelope to this address: | Name ▼ Jeffrey H. Brown |
|---|---|
| | Number/Street/Apt ▼ Seyfarth Shaw LLP, 55 East Monroe Street, Suite 4200 |
| | City/State/ZIP ▼ Chicago, IL 60603 |

**9**

*17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

Rev: July 2003—xxx  Web Rev: July 2003  ♲ Printed on recycled paper        U.S. Government Printing Office: 2000-461-113/20,021

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**Ⓒ Form TX**
For a Nondramatic Literary Work
UNITED STATES COPYRIGHT OFFICE

**TXu 1-239-559**

EFFECTIVE DATE OF REGISTRATION

0 8    0 8    2005
Month    Day    Year

---

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

**1** **TITLE OF THIS WORK ▼**
EXPRESS (1999)

**PREVIOUS OR ALTERNATIVE TITLES ▼**

**PUBLICATION AS A CONTRIBUTION** If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared. **Title of Collective Work ▼**

If published in a periodical or serial give: **Volume ▼**    **Number ▼**    **Issue Date ▼**    **On Pages ▼**

---

**2**

**a** **NAME OF AUTHOR ▼**
American Backhaulers

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☑ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶
Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous? ☐ Yes ☐ No
Pseudonymous? ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed ▼
computer program

**NOTE**
Under the law, the "author" of a "work made for hire" is generally not the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**b** **NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶
Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous? ☐ Yes ☐ No
Pseudonymous? ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

**c** **NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶
Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous? ☐ Yes ☐ No
Pseudonymous? ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

---

**3**

**a** **YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED** This information must be given in all cases.
1999 ◀ Year

**b** **DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK** Complete this information ONLY if this work has been published.
Month ▶ _____ Day ▶ _____ Year ▶ _____ ◀ Nation

---

**4**

**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2. ▼
CH Robinson Worldwide, Inc.
8100 Mitchell Road
Eden Prairie, MN 55344

**APPLICATION RECEIVED**
AUG 0 8 2005

**ONE DEPOSIT RECEIVED**
AUG 0 8 2005

**TWO DEPOSITS RECEIVED**

**FUNDS RECEIVED**

**TRANSFER** If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼
By assignment dated December 16, 1999

---

**MORE ON BACK ▶** • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions. • Sign the form at line 8.

DO NOT WRITE HERE
Page 1 of ____ pages

| EXAMINED BY | *Joe* | FORM TX |
|---|---|---|
| CHECKED BY | ✓ | |
| ☐ CORRESPONDENCE ☐ Yes | | FOR COPYRIGHT OFFICE USE ONLY |

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
☐ Yes ☒ No If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼
a. ☐ This is the first published edition of a work previously registered in unpublished form.
b. ☐ This is the first application submitted by this author as copyright claimant.
c. ☐ This is a changed version of the work, as shown by space 6 on this application.
If your answer is "Yes," give: Previous Registration Number ▶            Year of Registration ▶

**5**

**DERIVATIVE WORK OR COMPILATION**
Preexisting Material Identify any preexisting work or works that this work is based on or incorporates. ▼

**a**

**6**

Material Added to This Work Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

**b**

See instructions before completing this space.

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
Name ▼                                    Account Number ▼

**a**

**7**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent.   Name/Address/Apt/City/State/ZIP ▼

Jeffrey H. Brown
Seyfarth Shaw LLP
55 East Monroe Street, Suite 4200, Chicago, IL 60603

**b**

Area code and daytime telephone number ▶ 312.781.8604            Fax number ▶ 312.269.8869
Email ▶      jbrown@seyfarth.com

**CERTIFICATION*** I, the undersigned, hereby certify that I am the
Check only one ▶
☐ author
☒ other copyright claimant
☐ owner of exclusive right(s)
☐ authorized agent of _____
Name of author or other copyright claimant, or owner of exclusive right(s) ▲

**8**

of the work identified in this application and that the statements made
by me in this application are correct to the best of my knowledge.

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.

CHAD LINDBLOOM, VP + CFO                    Date ▶ 7/25/05

Handwritten signature (X) ▼

X _____

| Certificate will be mailed in window envelope to this address: | Name ▼ Jeffrey H. Brown | | **9** |
|---|---|---|---|
| | Number/Street/Apt ▼ Seyfarth Shaw LLP, 55 East Monroe Street, Suite 4200 | | |
| | City/State/ZIP ▼ Chicago, IL 60603 | | |

*17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

Rev: July 2003—xxx  Web Rev: July 2003  ⟳ Printed on recycled paper                    U.S. Government Printing Office: 2000-461-113/20,021

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, United States Code,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America




**Form TX**
For a Nondramatic Literary Work
UNITED STATES COPYRIGHT OFFICE

**TXu 1-247-636**

EFFECTIVE DATE OF REGISTRATION

Month *AUG* Day *10* Year *05*

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**1**

**TITLE OF THIS WORK ▼**
EXPRESS (2002)

**PREVIOUS OR ALTERNATIVE TITLES ▼**
EXPRESS (1999)

**PUBLICATION AS A CONTRIBUTION** If this work was published as a contribution to a periodical, serial, or collection, give information about the
collective work in which the contribution appeared.     **Title of Collective Work ▼**

If published in a periodical or serial give: **Volume ▼**     **Number ▼**     **Issue Date ▼**     **On Pages ▼**

**2**

**a** **NAME OF AUTHOR ▼**
CH Robinson Worldwide, Inc.

**DATES OF BIRTH AND DEATH**
Year Born ▼     Year Died ▼

Was this contribution to the work a
"work made for hire"?
☑ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶
{ Domiciled in▶

**WAS THIS AUTHOR'S CONTRIBUTION TO
THE WORK**
Anonymous?     ☐ Yes ☐ No
Pseudonymous?  ☐ Yes ☐ No
If the answer to either
of these questions is
"Yes," see detailed
instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼
computer program

**NOTE**

Under the law,
the "author" of
a "work made
for hire" is
generally the
employer, not
the employee
(see instructions). For any
part of this
work that was
"made for hire"
check "Yes" in
the space
provided, give
the employer
(or other
person for
whom the work
was prepared)
as "Author" of
that part, and
leave the
space for dates
of birth and
death blank.

**b** **NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼     Year Died ▼

Was this contribution to the work a
"work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶
{ Domiciled in▶

**WAS THIS AUTHOR'S CONTRIBUTION TO
THE WORK**
Anonymous?     ☐ Yes ☐ No
Pseudonymous?  ☐ Yes ☐ No
If the answer to either
of these questions is
"Yes," see detailed
instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

**c** **NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼     Year Died ▼

Was this contribution to the work a
"work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶
{ Domiciled in▶

**WAS THIS AUTHOR'S CONTRIBUTION TO
THE WORK**
Anonymous?     ☐ Yes ☐ No
Pseudonymous?  ☐ Yes ☐ No
If the answer to either
of these questions is
"Yes," see detailed
instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

**3**

**a** **YEAR IN WHICH CREATION OF THIS
WORK WAS COMPLETED** This information
must be given
2002 ◄Year in all cases.

**b** **DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK**
Complete this information     Month▶          Day▶          Year▶
ONLY if this work
has been published.                                        ◄ Nation

**4**

**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as
the author given in space 2. ▼
CH Robinson Worldwide, Inc.
8100 Mitchell Road
Eden Prairie, MN 55344

See instructions
before completing
this space.

**TRANSFER** If the claimant(s) named here in space 4 is (are) different from the author(s) named in
space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

APPLICATION RECEIVED
AUG 10 2005
ONE DEPOSIT RECEIVED
AUG 10 2005
TWO DEPOSITS RECEIVED

FUNDS RECEIVED

DO NOT WRITE HERE
OFFICE USE ONLY

---

**MORE ON BACK ▶** • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.     • Sign the form at line 8.

DO NOT WRITE HERE

Page 1 of __ pages

| EXAMINED BY | | FORM TX |
|---|---|---|
| CHECKED BY | | |
| ☐ CORRESPONDENCE ☐ Yes | | FOR COPYRIGHT OFFICE USE ONLY |

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**5**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
☑ Yes ☐ No If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼
a. ☐ This is the first published edition of a work previously registered in unpublished form.
b. ☐ This is the first application submitted by this author as copyright claimant.
c. ☑ This is a changed version of the work, as shown by space 6 on this application.
If your answer is "Yes," give: Previous Registration Number ▶          Year of Registration ▶

**6**

**DERIVATIVE WORK OR COMPILATION**
Preexisting Material Identify any preexisting work or works that this work is based on or incorporates. ▼          **a**

Express (1999)

Material Added to This Work Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼          **b**

Additions of new material and revisions to computer program

See instructions before completing this space.

**7**

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.          **a**
Name ▼          Account Number ▼

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent.   Name/Address/Apt/City/State/ZIP ▼          **b**
Jeffrey H. Brown
Seyfarth Shaw LLP
55 East Monroe Street, Suite 4200, Chicago, IL 60603

Area code and daytime telephone number ▶ 312.781.8604          Fax number ▶ 312.269.8869
Email ▶   jbrown@seyfarth.com

**8**

**CERTIFICATION*** I, the undersigned, hereby certify that I am the
Check only one ▶ ☑ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☐ authorized agent of _____
Name of author or other copyright claimant, or owner of exclusive right(s) ▲
of the work identified in this application and that the statements made
by me in this application are correct to the best of my knowledge.

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.
Joseph J. Mulvihill          Date ▶ 8/5/05

Handwritten signature (X) ▼
X Joseph J Mulvihill

**9**

Certificate will be mailed in window envelope to this address:
Name ▼
Jeffrey H. Brown
Number/Street/Apt ▼
Seyfarth Shaw LLP, 55 East Monroe Street, Suite 4200
City/State/ZIP ▼
Chicago, IL 60603

YOU MUST:
• Complete all necessary spaces
• Sign your application in space 8

SEND ALL 3 ELEMENTS IN THE SAME PACKAGE:
1. Application form
2. Nonrefundable filing fee in check or money order payable to Register of Copyrights
3. Deposit material

MAIL TO:
Library of Congress
Copyright Office - TX
101 Independence Avenue, S.E.
Washington, D.C. 20559-6222

Fees are subject to change. For current fees, check the Copyright Office website at www.copyright.gov, write the Copyright Office, or call (202) 707-3000.

*17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

Rev: July 2003—xxxx   Web Rev: July 2003   ♻ Printed on recycled paper          U.S. Government Printing Office: 2000-461-113/20,021